IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JANE LUNA, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:11-cv-00093 |
| | ) | Judge Campbell/Knowles |
| RICKY J. BELL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court upon Plaintiff's "Renewed Motion for Sanctions." Docket No. 221. Plaintiff has filed a supporting Memorandum (Docket No. 222), and a number of exhibits (Docket Nos. 222-1 to 222-9). Defendants have filed a Response in Opposition to the Motion (Docket No. 234) with a number of exhibits (Docket Nos. 235-1 to 235-13). Plaintiff has filed a Reply. Docket No. 239. Judge Campbell has referred the Motion to the undersigned "for decision." Docket No. 224.

I. Introduction and Background

Judge Nixon has previously described the background of this action as follows:

> Jason Toll died during a cell extraction at Riverbend Maximum Security Institution. Following Mr. Toll's death, Plaintiff – his mother – brought this action as the Administratrix of Mr. Toll's estate against Defendants Correctional Officers Brandon Jackson, Gaelan Doss, Darrell Freeman, Bruce Bishop, Jr., Jeffrey Reckart, Corporal Sean Stewart, Captain James Horton, and Warden Ricky J. Bell. (Doc. No. 52). Plaintiff alleged claims on Mr. Toll's behalf pursuant to 42 U.S.C. § 1983 for excessive use of force and failure to train in violation of Mr. Toll's Fifth, Eighth, and

> Fourteenth Amendment rights. (*Id.* ¶¶ 94-123.) On Plaintiff's
> motion, the Court dismissed Defendants Reckart, Jackson, Stewart,
> Freeman, and Bishop from this action. (*See* Doc. No. 152.) The
> Court held a jury trial from August 13, 2013, to August 23, 2013.
> At the conclusion of the trial, the jury delivered a verdict in favor
> of Defendants Bell, Doss, and Horton on all counts. (Doc. Nos.
> 157; 160-61).
>
> On September 18, 2013, Plaintiff moved for a new trial under
> Federal Rule of Civil Procedure 59(a), alleging certain issues with
> the jury instructions. (Doc. Nos. 168-69.) Finding that the jury
> instructions were not misleading, confusing, or prejudicial, the
> Court denied the motion for a new trial. (Doc. No. 172 at 6-7.)

Docket No. 187, p. 1-2.

Subsequently, Plaintiff filed a "Motion to Reopen Case" (Docket No. 173), a "Rule 60(b) Omnibus Motion for Relief from the Judgments Entered in Favor of Defendants Ricky J. Bell, Gaelan Doss, and James Horton, and Motion for Relief from Order Denying New Trial" (Docket No. 174), and a single supporting Memorandum of Law (Docket No. 175). Plaintiff essentially alleged in those Motions that, on July 28, 2014, almost a year after the trial, the *New York Times* ran a story regarding the instant case. A reporter had submitted a Freedom of Information Act request, seeking the personnel file of William T. Amonette.[1] The story discussed a resignation letter from Mr. Amonette to Defendant Warden Bell that had not been produced by Defendants in their written discovery responses. The body of the resignation letter states in full as follows:

> After much thought and consideration, I have determined that it is
> necessary for me to resign my position with the Tennessee

---

[1] Mr. Amonette was initially sued as a Defendant in this action. Docket No. 1. Plaintiff alleged that Mr. Amonette was a member of the "Cell Extraction Team which assaulted Charles [Jason] Toll on or about August 17, 2010." *Id.*, p. 2. On September 25, 2012, Plaintiff and Mr. Amonette filed a joint motion for the dismissal of Plaintiff's claims against Defendant Amonette without prejudice. Docket No. 48. Shortly thereafter, Judge Nixon granted that motion and dismissed Plaintiff's claims against Mr. Amonette without prejudice. Docket No. 50.

2

> Department of Corrections. My reasons for this are two-fold.
>
> First, ever since I asked questions in your office about the witnesses in the Charles Toll case that were not spoken to by Internal Affairs, I have been treated poorly by your subordinates when I report to work.
>
> Secondly, I also discovered on February 2, 2011 that the records for my September 2, 2010 core training session were altered to reflect that I had eight (8) hours of training when I only received six (6) and I was told just to sign the time sheet. This is falsification of training records, and I was ridiculed at the time for not wanting to accept eight (8) hours pay for six (6) hours work. When I requested a slip to sign for two hours comp time, I was treated as if I was causing an inconvenience. Some guards advised me that they have done as little as four (4) hours training and were paid for eight (8) hours. With the extenuating circumstances surrounding proper officer training, I felt it necessary to make you aware of the situation.
>
> To put this simply, I cannot work somewhere where asking questions or trying to do what is right is punished. Please accept this letter as notification of my two week notice of separation.

Docket No. 235-1, p. 61.

According to Mr. Amonette, the resignation letter was accompanied by several additional documents, although it is not entirely clear which documents were provided to Warden Bell with the resignation letter.

In his ruling on the Motion to Reopen Case and the Rule 60(b) Omnibus Motion, Judge Nixon noted that the parties did not dispute that any letter written by then-Defendant Amonette to Defendant Bell should have been produced in response to Plaintiff's Rule 34 requests. Docket No. 187, p. 5. He further noted that Defendants' attorneys had submitted affidavits swearing that

3

they did not recall seeing Mr. Amonette's resignation letter during the course of discovery.[2]

Docket No. 187, p. 5, *citing* Docket Nos. 178-2 ¶ 3; 178-3 ¶ 3.

In his decision on the Motions, Judge Nixon quoted Fed. R. Civ. P. 60(b), which provides that the Court may relieve a party from a final judgment, order, or proceeding for the following reasons:

> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> [or]
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party[.]

Docket No. 187, p. 2.

Judge Nixon further stated that, in order to prevail on a Rule 60(b)(2) motion, "a 'movant must demonstrate (1) that it exercised due diligence in obtaining the information and (2) [that] the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.'" Docket No. 187, p. 2-3 (citations omitted). He stated that, in order to prevail on a Rule 60(b)(3) motion, the moving party must "show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question." *Id.*, p. 3 (citation omitted). He also noted that most grounds for relief under Rule 60(b) "relate to, if not require, new information about the case that could not reasonably have been discovered earlier." *Id.* (citation omitted).

---

[2]Plaintiff argues that Defendants have contended that they "never saw the resignation letter . . . ." Docket No. 222, p. 6. That statement, however, is simply not correct. Defendants have sworn that they do not recall seeing the letter.

4

While Plaintiff's Motions raised issues under both Fed. R. Civ. P. 60(b)(2) (relating to newly discovered evidence) and 60(b)(3) (fraud, misrepresentation, etc.), Judge Nixon noted in his opinion that "Plaintiff primarily seeks relief under Federal Rule of Civil Procedure 60(b)(2)." Docket No. 187, p. 3. Judge Nixon determined that the letter was "newly discovered evidence that could not have been discovered in time for Plaintiff to move for a new trial under Rule 59(b)." He further determined that the resignation letter constituted "material and controlling evidence that clearly would have produced a different result if presented before the original judgment." Docket No. 187, p. 6-7. Judge Nixon granted Plaintiff's Motions relying only on Rule 60(b)(2) and stating that Plaintiff was "entitled to relief under this Rule." *Id.*, p. 8.

Importantly, however, Judge Nixon's Order states:

> Plaintiff also seeks relief under Federal Rule of Civil Procedure 60(b)(3). In response to Plaintiff's argument that the judgments should be set aside based on fraud, misrepresentation, or misconduct by an opposing party (*see* Doc. Nos. 175 at 7; 180 at 2-3), defense counsel swears that no documents were intentionally withheld from Plaintiff's attorneys during discovery. (Doc. No. 179-1 ¶ 4.) Plaintiff did not allege any specific facts showing deliberate action such as fraud, misrepresentation, or misconduct on Defendants' part. Having studied the record, the Court finds that Plaintiff has fallen short of demonstrating by clear and convincing evidence that Defendants deliberately withheld Mr. Amonette's resignation letter. Therefore, relief under Federal Rule of Civil Procedure 60(b)(3) is not appropriate.

*Id.*

The same day Judge Nixon entered his Order on the two previous motions, he recused himself. Docket No. 188. The case was then reassigned to Judge Campbell. Docket No. 189. Thereafter, Defendants filed a Motion for Reconsideration of Judge Nixon's Order granting the two previous motions. Docket No. 191. Plaintiff filed a Response in Opposition to the Motion

5

(Docket No. 197), but Judge Campbell denied the Motion to Reconsider (Docket No. 198).

## II. Legal Standards

In the instant Motion, Plaintiff seeks sanctions for Defendants' failure to produce Mr. Amonette's resignation letter. Plaintiff seeks an order that "Defendants" pay *all* Plaintiff's attorneys' fees, "support staff fees," and costs in the total amount of $425,666.82.[3]

Plaintiff's request for sanctions is based solely upon the Court's "broad inherent power to impose sanctions for abusive conduct during discovery . . . ." Docket No. 222, p. 5. Plaintiff does not specifically discuss any other authority for the imposition of sanctions under the circumstances present here.

Both parties appear to recognize that the leading case regarding a court's inherent powers to award attorney's fees and related expenses as a sanction is *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). In *Chambers*, defendant contracted to sell plaintiff a television station for a purchase price of $18 million. Defendant apparently changed his mind and tried to talk plaintiff out of consummating the sale, but plaintiff refused.

In *Chambers*, defendant and his attorney engaged in a pattern of abuse over a period of two years involving: defendant's refusal to abide by a preliminary injunction allowing plaintiff to inspect defendant's corporate records; his attempt to place the property beyond the reach of plaintiff by selling it to a "third party," a trust with defendant's sister as trustee and his three adult children as beneficiaries; he "proceeded with 'a series of meritless motions and pleadings and delaying actions'"; he sought to render the purchase agreement meaningless by seeking

---

[3]It is unclear whether Plaintiff seeks to recover the fees and expenses from the individual Defendants or from Defendants' attorneys, all of whom were employed by the office of the Tennessee Attorney General.

permission from the FCC to build a new transmission tower for the station and to relocate the transmission facilities to that site, which was not covered by the parties' agreement; he removed all the equipment from the station at issue without notice to the court or NASCO; and he was held in contempt of court at least once during the proceedings.

The Supreme Court upheld a sanction of almost $1 million, "which represented the entire amount of [plaintiff's] litigation costs paid to its attorneys." *Id.*, p. 40 (footnote omitted).

The *Chambers* Court stated:

> This case requires us to explore the scope of the inherent power of a federal court to sanction a litigant for bad-faith conduct. Specifically, we are asked to determine whether the District Court, sitting in diversity, properly invoked its inherent power in assessing as a sanction for a party's bad-faith conduct attorney's fees and related expenses paid by the party's opponent to its attorneys.

*Id.*, p. 35.

The Supreme Court stated that the proper scope of review is abuse of discretion. *Id.*, p. 55. The *Chambers* Court stated:

> Indeed, "[t]here are ample grounds for recognizing . . . that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel" . . . even though the so-called "American Rule" prohibits fee shifting in most cases. See *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975).
>
> . . .
>
> [A] court may assess attorney's fees when a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" [*Citing Alyeska*, 421 U.S at 258-259.]

501 U.S. at 44.

7

The *Chambers* Court also stated, "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* The Court found, based on the circumstances, that the District Court had "acted within its discretion in assessing as a sanction for [defendant's] bad-faith conduct the entire amount of NASCO's attorney's fees." *Id.*

The Sixth Circuit has recently addressed the issue of awarding sanctions under a court's inherent powers. In *BDT Products, Inc. v. Lexmark International, Inc.*, 602 F.3d 742, 751-52 (6th Cir. 2010), the court stated:

> We review a court's imposition of sanctions under its inherent powers for abuse of discretion. [c*iting Chambers*, 501 U.S. at 55]. Before considering whether the district court abused its discretion in imposing such sanctions, we take the opportunity to clarify our case law on when a district court may assess attorney fees under its inherent powers . . . .
>
> . . .
>
> [A] court may assess attorney fees against a party under the court's inherent powers "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" [*citing Chambers*, 501 U.S. at 45.] This "bad faith exception" to the American Rule - the imposition of sanctions under a court's inherent powers - thus *requires* a finding of bad faith or conduct "tantamount to bad faith."

602 F.3d at 752 (emphasis in original).

The Sixth Circuit has also stated, "An award of attorney's fees . . . is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Ray A. Scharer & Co., Inc., v. Plabell Rubber Products, Inc.*, 858 F.2d 317, 320 (6th Cir. 1988) (citation omitted).

### III. Analysis

Plaintiff relies primarily upon the following circumstances in order to justify the imposition of sanctions: (1) the record shows that Debbie Inglis, TDOC General Counsel,

8

provided the resignation letter to Defendants' counsel, Arthur Crownover II, on February 18, 2011, and the letter should have been produced with the original document production by Defendants; (2) even if the letter had not been produced in the original production, Defendants were under a duty to supplement their discovery, and should have provided it at a later date; (3) there are two versions of the resignation letter, and Defendants have never produced the documents attached to the letter; (4) Defendants produced two different personnel files of Mr. Amonette, one of which was missing one hundred forty-six pages; and (5) on September 12, 2015, Mr. Amonette gave a forty-six page "Statement on the Record" to Plaintiff's counsel regarding a number of matters, including his resignation letter, in which he stated under oath that he discussed the resignation letter with General Crownover on two different occasions.

Defendants argue that: (1) General Crownover's Affidavits clearly establish that Defendants did not act in bad faith by failing to produce the resignation letter; (2) the instant Motion is based upon their failure to produce one document out of three thousand pages of documents that were produced; (3) Plaintiff knew of the resignation letter long before the trial of this case, because it was discussed in Mr. Amonette's deposition taken January 25, 2012; (4) the failure to produce the resignation letter was the result of an "unfortunate confluence of events," not bad faith; (5) the Court should strike Mr. Amonette's "Statement on the Record," because it was taken completely without notice to or participation by Defendants' counsel; (6) the difference in the length of Mr. Amonette's two separate personnel files has not been shown to be relevant to any issues; (7) while there may be two "versions" of the resignation letter, the bodies of the letters are the same, but the fonts are different, and this fact is not relevant to any issues; (8) Defendants were under no duty to supplement, but even if they were, their failure to do so did

not constitute bad faith.

Plaintiff concedes, as she must, that "Judge Nixon did not find that Plaintiff had proven fraud, misrepresentation or misconduct in her Rule 60(b) Motion . . . ." Plaintiff contends, however, that Defendants, "by and through counsel, General Crownover in particular, engaged in willful conduct," which amounted to bad faith. Docket No. 222, p. 12-13.

It appears from the Record that General Crownover was Defendants' lead counsel. He has filed three Affidavits in this action. Docket Nos. 178-2, 179-1, 235-1. In his first Affidavit, executed August 29, 2014, he stated in relevant part:

> 3. I cannot state for certain whether William Amonette's resignation letter was in the Amonette personnel file which was produced or it was not. I did not exhaustively review the many, many pages of the personnel files of the defendants, and I do not recall the resignation letter. Support staff of the Attorney General's Office closed the Toll file for archiving this summer [2014]. Discovery materials are routinely destroyed when a file is closed, and they were routinely destroyed when the Toll file was closed. This included the personnel files of the defendants. I cannot now review the personnel files and other discovery documents that were in the file.
>
> 4. I did not intentionally withhold any documents from the plaintiff's attorneys in discovery.

Docket No. 178-2, p. 2.

In his second Affidavit, executed September 22, 2014, he stated in part:

> 2. Since my first Affidavit was executed on August 29, 2014, a paralegal in the office has discovered a computer file with an original scanned copy of William Amonette's personnel file and a redacted copy of the personnel file. The resignation letter of Mr. Amonette is not in these computer files.
>
> 3. I do not recall the resignation letter. I do not know whether it could have been in other documents I received during the progress of this case.

10

> 4. I did not intentionally withhold any documents from the plaintiff's attorneys in discovery.

Docket No. 179-1, p. 1-2.

In his third Affidavit, General Crownover stated in part:

> 1. I did not intentionally withhold any documents from the plaintiff's attorneys in discovery in this case. I have told the truth in the affidavits that have been filed with this Court. I do not recall the resignation letter of William Amonette.

Docket No. 235-1, p. 1.

General Crownover's third Affidavit also states:

> 26. The Civil Rights and Claims Division of the Attorney General's Office has recently moved to the UBS Tower, and staff packed up the Toll file for the move. Staff was directed to review the entire file for any documents which could be relevant to plaintiff's current motion. Staff found in the Toll file a copy of Mr. Amonette's resignation letter that TDOC General Counsel Debbie Inglis had faxed to me on February 18, 2011. Staff also found a fax dated February 16, 2011 from our Office to Attorney Inglis with Mr. Amonette's Request for Representation attached. It appears that Attorney Inglis's fax to me was sent in connection with the Amonette Request for Representation. Attorney Inglis's fax of Mr. Amonette's resignation letter was not a part of Warden Bell's response to plaintiff's request for production of documents, and it would not have been placed or filed with said document production, which arrived in boxes from RMSI. Staff also found a yellow-highlighted and underlined copy of the resignation letter, with three holes punched on the side. I do not recall receiving the fax from Attorney Inglis nor do I recall highlighting, underlining or punching holes on the side of a copy of the letter. It is not my routine to punch holes in a document as I use folders, not binders, to hold documents for trial. A copy of the February 16, 2011 fax from our office, a copy of Attorney Inglis's fax and attached letter thereto and a copy of the yellow highlighted copy of the letter are attached, marked exhibits R, S, and T.
>
> 27. In the statement filed by the plaintiff (DE No. 222-4), Mr. Amonette contends that I called him on February 16, 2011, and spoke on the telephone for 15 to 20 minutes. I allegedly asked

11

why he wrote the resignation letter and discussed it. I also allegedly told Mr. Amonette that it was hard on the TDOC. I may have spoken on the telephone with Mr. Amonette at some point during my representation of him in this case. I do not recall. However, telephoning a TDOC employee who has requested representation is not my routine practice, and I would not routinely call an employee who has submitted a detailed request for representation, as Mr. Amonette did. In addition, there was a comprehensive Internal Affairs investigation of the incident with inmate Toll. As is my standard practice, I relied upon the conclusions of the investigation that showed no indication of any conflict in representing all of the employees, including Mr. Amonette. I do not recall telephoning any of the employees who requested representation, as I had no reason to call any of them. I recall no phone conversation with Mr. Amonette regarding the resignation letter.

28. In addition, I have now reviewed the contents of the resignation letter, and it is not material, controlling or worthy of any note as to the central issue of this lawsuit. During my defense in this case, I was always focused on developing the proof that the defendants did not use excessive force in extracting Charles Toll from his cell. If a jury found no excessive force, any training received by the officers is a non-issue. If the jury found excessive force, training is still not relevant as no training teaches a person to be malicious and sadistic. Moreover, Mr. Amonette's allegations in his resignation letter concerned his September, 2010 training, which occurred after Mr. Toll's August, 2010 cell extraction and clearly had no relevance. In my considered view, the resignation letter is not relevant, and I would not have wasted my time discussing it with Mr. Amonette or anybody else. There were other areas of much more concern, including the autopsy report, the videotape of the incident and possible criminal indictment of the defendants. The resignation letter would not have been important to me. The training was a non-issue and was not important to me.

29. Mr. Amonette's deposition was scheduled on January 25, 2012. He and I met a day or so before the deposition to discuss the case and deposition procedures. As I tell all my clients, I told Mr. Amonette to tell the truth during his deposition. I never told Mr. Amonette to lie about the evidence or to not be forthcoming about any subject. He and I discussed the rumors that Mr. Amonette had supplied inside information from prison officials to the plaintiff's

lawyers, which he denied. He also told me about problems he had getting some of his work shifts at RMSI covered by other officers and subsequently being disciplined. Near the end of the meeting, Mr. Amonette stated that he had written a resignation letter, and I recall saying to him that the resignation letter would be in his personnel file. I do not recall ever looking in the personnel file for the resignation letter. That was the extent of any discussion regarding the resignation letter.

30. When Mr. Amonette testified about his disciplinary problems and resignation at his videotaped deposition, taken January 25, 2012, it was consistent with what he told me before the deposition when we met.

31. Mr. Amonette was questioned by plaintiff's attorney, David Weissman, about the resignation letter in the deposition, and Mr. Amonette testified that he wrote a resignation letter. A copy of the entire Amonette deposition has previously been filed (DE No. 178-4). After the Amonette deposition, if the plaintiff's attorneys had reviewed the documents produced and could not find the resignation letter in the personnel file and had inquired to me for production of the letter, I would have reviewed my files to produce a copy of [the] letter and/or I would have requested a copy of the resignation letter from TDOC. Mr. Amonette also testified that he had a copy of the resignation letter. In any event, I would have provided a copy of the document to the plaintiff's attorneys without delay. The plaintiff's attorneys never made the inquiry. Mr. Amonette's deposition was taken some nineteen (19) months before the jury trial, and there was more than ample and reasonable opportunity for the plaintiff's attorneys to make the inquiry for the resignation letter. If the plaintiff's attorneys thought it necessary, Mr. Amonette's deposition could have been reconvened. The plaintiff's lawyers never mentioned the resignation letter again until they filed the Motion to Reopen the Case on August 22, 2014.

32. Mr. Amonette contends in his statement that after his deposition on January 25, 2012, I had a discussion with him in the hallway, and asked him how he did. Mr. Amonette allegedly said to me that I probably did not like him testifying about the resignation letter. I allegedly said. [*sic*] "Yeah, I could have done without those." I also allegedly said, "Well, he didn't follow up with you." This conversation did not happen. I no doubt told Mr. Amonette after the deposition that he did well, as it is my routine practice to do this after every client's deposition. The client has

13

been through a stressful event, and I try to encourage him or her. I am sure I did not comment on the evidence, and I would never have asked my client how he thought he did. That is just not productive. I did not tell Mr. Amonette that he should not have been truthful and forthcoming at the deposition. As I stated before, my routine practice when meeting with a client before a deposition is to tell him or her to tell the truth and that we have nothing to hide. I would not have told him anything different after the deposition.

33. In responding to the plaintiff's Motion to Reopen and Set Aside the Judgment (DE No. 173), our focus was on the lack of due diligence on the part of the plaintiff's attorneys to procure the resignation letter after Mr. Amonette testified to its existence at his deposition on January 25, 2012. Attorney Lorch and I did not investigate to determine if and why the resignation letter was not in the personnel file of Mr. Amonette that had been produced. It was not relevant to the central issues of the pending motion. What was relevant was plaintiff's counsel's lack of due diligence in failing to search for and review said letter prior to trial.

34. My understanding was that an employee's resignation letter would be in an employee's personnel file as I stated in my brief discussion with Mr. Amonette before his deposition. I have since learned differently as to Mr. Amonette's letter due to the time frame when the documents were requested and received from the prison in February, 2011. Mr. Amonette's letter was not placed in his personnel file until he had left TDOC employment, and it was not in the copy of the personnel file that I received from the prison.

35. I did not intentionally withhold any documents from the plaintiff's attorneys in discovery. I have told the truth in the affidavits that have been filed with this Court. I do not recall the Amonette resignation letter. If I made a mistake, the plaintiff's attorneys could easily have rectified it by exercising diligence and specifically requesting the resignation letter after Mr. Amonette was questioned about it at his deposition.

36. Plaintiff's counsel did not seek leave of the Court nor provide notice to defendants' counsel prior to taking Mr. Amonette's second deposition on September 12, 2015 (the "statement on the record").

Docket No. 235-1, p. 7-11.

In their Response, Defendants argue that their failure to produce the resignation letter was the "inadvertent result of an unfortunate confluence of events." Docket No. 234, p. 1-2. They point out that they produced more than three thousand pages of documents in response to Plaintiff's Requests for Production and were simply unaware that this one document was not among those produced.

Defendants describe the "unfortunate confluence of events" as follows. On February 1, 2011, the day before Plaintiff filed this action, TDOC General Counsel Debbie Inglis received a copy of the Complaint and Plaintiff's initial discovery requests. Docket No. 235-1, p. 2 ("Third Affidavit of Arthur Crownover II"). The discovery requests included a request for the production of the personnel record of each Defendant. *Id.* Warden Ricky Bell notified appropriate RMSI departments to pull responsive documents after he was served with the Complaint and discovery on February 3, 2011. Docket No. 235-9, p. 1 ("Bell Affidavit"). Thus, by February 16, 2011, Mr. Crownover received two large boxes of documents from Warden Bell's office. Docket No. 235-2, p. 1 ("Moran Affidavit"); Docket No. 235-1, p. 4. These boxes included the personnel file of Mr. Amonette. *Id.*

During the same period of time, Mr. Amonette was facing disciplinary action within TDOC. Mr. Amonette apparently had refused to work overtime on January 20, 2011, which was necessary because of weather conditions. Docket No. 222-2, p. 13 ("Amonette Personnel file"). He was charged with insubordination, and received a written due process disciplinary notice on January 24, 2011. *Id.* The Employee Review Board held a hearing, found him guilty of insubordination, and recommended a two-day suspension. *Id.*, p. 5. On February 7, 2011 (which happens to be the date of Mr. Amonette's resignation letter) Warden Bell sent a memorandum to

Mr. Amonette suspending him for two days, February 14 and 15, 2011.  *Id.*

Mr. Amonette's resignation letter actually gives two weeks' notice of his resignation, and, therefore, his resignation would not have been effective until February 21, 2011.  Docket No. 175-5.  Defendant explains that it is not uncommon for an employee to submit and rescind a resignation and, therefore, the letters do not become part of the personnel file until the resignation becomes effective after the notice period expires.  Docket No. 235-4, p. 1-2 ("Cunningham Affidavit").  His resignation letter, therefore, would not have become a part of his personnel file until February 21, 2011.  *Id.*

It appears from the foregoing that Warden Bell supplied Mr. Amonette's personnel file to General Crownover by February 16, 2011.  The resignation letter would not have been in the file at that point.  As discussed above, a fax dated February 16, 2011, indicates that Mr. Amonette had submitted a request for representation to the Attorney General's Office.  General Crownover believes that the Inglis fax dated February 18 was sent in connection with the request for representation, and not as part of the document production.  Because the resignation letter was not a part of Warden Bell's response to the requests for production, it would not have been placed in or filed with the boxes from Warden Bell.

In view of the foregoing, the Court simply cannot conclude that Defendants or their counsel acted in bad faith or took actions that were tantamount to bad faith.

Plaintiff's strongest points appear to be that General Crownover received a copy of Mr. Amonette's resignation letter on February 18, 2011, and that Mr. Amonette has stated under oath that he discussed the resignation letter with Mr. Crownover on two different occasions.  General Crownover's explanations in his Affidavits, particularly his third Affidavit, are convincing.  He

16

explains in detail why the letter apparently was not produced in the initial document production, and he also explains why he would not have focused upon the letter.

Furthermore, as discussed above, Plaintiff's counsel knew about the resignation letter during the deposition of Mr. Amonette, which was taken approximately nineteen months before the trial occurred in this case. Plaintiff's counsel took the deposition of Mr. Amonette on January 25, 2012. Docket No. 178-4. At that time, Mr. Amonette was a defendant in this action. The following testimony occurred:

> Q. [by Mr. Weissman]: Did you submit a written resignation letter, Mr. Amonette?
> A. Yeah, with about eight pages on it.
> Q. Okay. Did you keep a copy of that?
> A. Yeah. I gave one to the Department of Corrections too.
> Q. Okay.
> A. As a matter of fact, it's - it should be in my personnel file.
> Mr. Weissman: All right. I don't have anything else for you.
> The Witness: Good deal.

Docket No. 178-4, p. 66.

Plaintiff argues that she should have been able to rely upon the original document production for the proposition that the letter would already have been produced. Under the circumstances, however, it seems clear that Plaintiff's counsel had an obligation to follow up on the resignation letter. At least, counsel should not be heard to fault Defendants for failing to produce the letter and to seek attorneys' fees in the amount of more than $400,000, while arguing that General Crownover should have known about the letter while he himself claims he did not.

Plaintiff apparently relies upon Mr. Amonette's "Statement on the Record" primarily for its discussion of the two conversations Mr. Amonette allegedly had with General Crownover

17

regarding the resignation letter.[4] Assuming that those conversations did happen, they still do not indicate that General Crownover acted in bad faith when he failed to produce the resignation letter. As discussed above, General Crownover has given a cogent explanation for why he would not have focused upon the resignation letter or its absence.

Plaintiff's argument that Defendants were under a duty to supplement their discovery responses is unavailing. Had Defendants done so, given the foregoing circumstances, they would have had no reason to look for a resignation letter. In any event, however, any failure to supplement would not equate to bad faith on the part of Defendants.

Plaintiff argues that, at some point, the resignation letter was altered. Plaintiff has no evidence to support an argument that these Defendants or their counsel altered any resignation letter.

IV. Conclusion

For the foregoing reasons, the undersigned recommends that the instant "Renewed Motion for Sanctions" (Docket No. 221) be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any

---

[4]Defendants have filed a Motion to Strike the Statement, which the Court has denied. (Docket Nos. 233, 255.) The Court has very serious doubts as to whether the Statement on the Record should be considered at all, since it was essentially an ex parte deposition taken after Plaintiff's counsel had plainly discussed the substance with Mr. Amonette. Nevertheless, Defendants have addressed the arguments based on the Statement, and the Court will assume without deciding that the relevant portions of the Statement on the Record are admissible and should be considered.

18

response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

    /s/ E. Clifton Knowles
E. CLIFTON KNOWLES
United States Magistrate Judge